# In the United States Court of Federal Claims

Nos. 21-1116, 21-1118, 21-1119
(Filed Under Seal: February 7, 2024)
(Reissued for Publication: February 21, 2024)[1]

```
*************************************
CONNECTICUT YANKEE ATOMIC          *
POWER COMPANY,                     *
                                   *
               Plaintiff,          *
                                   *
       and                         *
                                   *
MAINE YANKEE ATOMIC POWER          *
COMPANY,                           *
                                   *
               Consolidated Plaintiff, *
                                   *
       and                         *
                                   *
YANKEE ATOMIC ELECTRIC             *
COMPANY,                           *
                                   *
               Consolidated Plaintiff, *
                                   *
       v.                          *
                                   *
THE UNITED STATES,                 *
                                   *
               Defendant.          *
*************************************
```

*Lucus A. Ritchie*, Pierce Atwood LLP, Portland, ME, counsel for Plaintiffs. With whom were *Katherine S. Kayatta* and *Cameron Goodwin*, of counsel.

*Daniel B. Volk*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom were *Igor Helman*, *Margaret J. Jantzen*, and *Elinor J. Kim*, U.S. Department of Justice, Civil Division, of counsel, and *Brighton Springer*, Office of the General Counsel, U.S. Department of Energy, of counsel.

---

[1] This Opinion and Order was filed under seal on February 7, 2024, *see* [ECF 109], in accordance with the Protective Order entered on October 12, 2021, *see* [ECF 21]. The parties were given until February 21, 2024, to propose redactions. The parties filed a joint status report on February 21, 2024, stating that no redactions were needed. [ECF 112] at 2. Accordingly, the Court reissues this Opinion and Order without redactions.

**OPINION AND ORDER**

**DIETZ, Judge.**

In this consolidated action, Connecticut Yankee Atomic Power Company, Maine Yankee Atomic Power Company, and Yankee Atomic Electric Company (collectively, "the Yankees") seek damages from the United States for partial breach of contract by the Department of Energy ("DOE") arising from its failure to accept and dispose of the Yankees' spent nuclear fuel. Before the Court are cross-motions for summary judgment on the issue of whether investment earnings on the Yankees' Nuclear Decommissioning Trusts ("NDTs") should be considered in the calculation of damages. For the reasons stated below, the Court finds that the NDTs and their investment performance is not relevant to the computation of damages. Therefore, the Yankees' motion for summary judgment is **GRANTED**, and the government's motion is **DENIED**.

**I.     BACKGROUND**

Each of the Yankees previously operated a nuclear power plant that has been shut down and decommissioned since 2007.[2] *See* Compl. [ECF 1] ¶ 28.[3] In 1983, under the Nuclear Waste Policy Act of 1982, the DOE entered a contract (the "Standard Contract") with each of the Yankees. *See* [ECF 1] ¶ 1.[4] Under the Standard Contract, the DOE promised to accept and permanently dispose of the Yankees' spent nuclear fuel and high-level nuclear waste (collectively "SNF") in exchange for a fee. *See id.*[5] The DOE promised to begin accepting the Yankees' SNF by January 31, 1998, *see id.* ¶ 33;[6] however, the DOE has not yet done so, *see id.* at ¶¶ 2, 37.[7] As a result, the Yankees continue to incur costs for storing and safeguarding the SNF at the Independent Spent Fuel Storage Installations ("ISFSIs") built on the sites of the Yankees' former nuclear power plants. *See id.* ¶¶ 28, 40.[8]

In 2000, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") affirmed the United States Court of Federal Claims' decision that the Yankees could

---

[2] Connecticut Yankee's sole nuclear power plant, located in Haddam Neck, Connecticut, stopped generating power in 1996 and was decommissioned in 2007. Joint Prelim. Status Report [ECF 16] at 5. Maine Yankee's sole nuclear power plant, located in Wiscasset, Maine, stopped generating power in 1996 and was decommissioned in 2005. *Id.* Yankee Atomic's sole nuclear power plant, located in Rowe, Massachusetts, stopped generating power in 1992 and was decommissioned in 2007. *Id.*

[3] *See also* Compl. [ECF 1] ¶ 28 in Civil Action Nos. 21-1118 and 21-1119.

[4] *See also* [ECF 1] ¶ 1 in Civil Action Nos. 21-1118 and No. 21-1119.

[5] *See also* [ECF 1] ¶ 1 in Civil Action Nos. 21-1118 and 21-1119.

[6] *See also* [ECF 1] ¶ 33 in Civil Action Nos. 21-1118 and 21-1119.

[7] *See also* [ECF 1] ¶¶ 2, 37 in Civil Action Nos. 21-1118 and 21-1119.

[8] *See also* [ECF 1] ¶¶ 28, 40 in Civil Action No. 21-1118; Compl. [ECF 1] ¶¶ 28, 40 in Civil Action No. 21-1119.

immediately sue the government based on its breach of the Standard Contract. *Me. Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337 (Fed. Cir. 2000). Further, in *Indiana Michigan Power Company v. United States*, the Federal Circuit held that where the alleged breach of contract was partial, plaintiffs retain their right to sue for damages following the occurrence of additional breaches of contract. 422 F.3d 1369, 1377-78 (Fed. Cir. 2005). Thus far, the Yankees have filed successive suits seeking damages incurred during four periods of time, referred to by the parties as "phases." [ECF 16] at 2-3.[9] The Yankees have recovered damages of approximately $160,000,000 for phase I,[10] approximately $235,000,000 for phase II,[11] approximately $77,000,000 for phase III,[12] and approximately $104,000,000 for phase IV.[13] In the instant case, the Yankees seek approximately $149,000,000 in damages incurred during phase V, which runs from January 1, 2017, through at least December 31, 2020. [ECF 16] at 3; Pls.' Mot. for Partial Summ. J. [ECF 77] at 14 (noting that, unlike phase IV, phase V covers a five-year period). Because the Federal Circuit already found the DOE liable for a partial breach of the Standard Contract, *Me. Yankee Atomic Power*, 225 F.3d at 1343, the only issue before the Court in this case is the amount owed to the Yankees for phase V, *see* [ECF 16] at 3.

On May 19, 2023, the Yankees moved for partial summary judgment on the issue of whether investment earnings on the NDTs maintained by each of the Yankees are properly considered in calculating damages for phase V. [ECF 77]. On June 26, 2023, the government cross-moved for summary judgment on the same issue. Def.'s Cross-Mot. for Summ. J. [ECF 87]. The motions are fully briefed, and the Court held oral argument on November 2, 2023. [ECF 102].

## II.   STANDARD OF REVIEW

Summary judgment may be entered on part of a claim or defense if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(a); *Hansen Bancorp., Inc. v. United States*, 367 F.3d 1297, 1308 (Fed. Cir. 2004). An issue is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Id.* The moving party has the burden of demonstrating "the absence of genuine issues of material fact." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994). However, the moving party "need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing . . . that there is an absence of evidence to support the

---

[9] Phase I covered damages incurred through December 31, 2001 (December 31, 2002, for Maine Yankee); Phase II covered damages incurred from January 1, 2002 (January 1, 2003, for Maine Yankee) through December 31, 2008; Phase III covered damages incurred from January 1, 2009, through December 31, 2012; and Phase IV covered damages incurred from January 1, 2013, through December 31, 2016. *See* [ECF 16] at 2 n.1-4 (citing cases).

[10] *See* Compl. [ECF 1] ¶ 12 in Civil Action Nos. 21-1116, 21-1118, and 21-1119.

[11] *See* Compl. [ECF 1] ¶ 16 in Civil Action Nos. 21-1116, 21-1118, and 21-1119.

[12] *See* Compl. [ECF 1] ¶ 21 in Civil Action Nos. 21-1116, 21-1118, and 21-1119.

[13] *See* Compl. [ECF 1] ¶¶ 24-25 in Civil Action Nos. 21-1116, 21-1118, and 21-1119.

nonmoving party's case." *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 255). On cross-motions for summary judgment, "each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered." *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968-69 (Fed. Cir. 2009).

### III. DISCUSSION

The Yankees ask the Court to find that "the investment performance of their [NDTs] is irrelevant to the computation of damages resulting from the [g]overnment's breach of contract, and [] any net gains from the NDTs do not serve to offset the Yankees' claimed costs" in phase V. [ECF 77] at 8. The Yankees assert that they did not receive any benefit from the NDTs investment performance because the earnings belong to ratepayers, that the NDTs are not a mitigation activity undertaken in response to the government's partial breach of the Standard Contract, and that the investment earnings were not directly caused by the government's breach. *Id.* at 24. The government maintains that the Yankees' damages calculation should account for the investment earnings on their NDT funds. [ECF 87] at 11. The government states that "all the costs claimed by the Yankees in this case were covered by investment earnings," and that therefore, "as a matter of law, no damages are due in this case." *Id*. at 25. The government contends that the "NDT investment earnings unquestionably benefit [the Yankees]," *id*. at 27, and that the "continued maintenance of their NDTs is unquestionably a mitigation activity" resulting from the government's partial breach of the Standard Contract, *id*. at 28. The Court finds that it would be improper to use the NDTs' investment earnings to satisfy the Yankees' claimed damages because (1) the NDTs are not a mitigation activity, and the NDTs' investment earnings are a remote consequence of the breach and (2) the NDTs' investment earnings have not conferred a benefit on the Yankees.

#### A. Overview of NDTs

On June 27, 1988, the United States Nuclear Regulatory Commission ("NRC") issued technical and financial criteria for decommissioning licensed nuclear facilities. General Requirements for Decommissioning Nuclear Facilities, 53 Fed. Reg. 24018 (June 27, 1988) (to be codified at 10 C.F.R. pts. 30, 40, 50, 51, 70, 72). The criteria included "decommissioning planning needs, timing, funding methods, and environmental review requirements." *Id*. The intent of the criteria was "to assure that decommissioning of all licensed facilities will be accomplished in a safe and timely manner and that adequate licensee funds will be available for this purpose." *Id*.

As to funding requirements, the regulations require that licensees indicate to the NRC how they "will provide reasonable assurance that funds will be available for the decommissioning process." 10 C.F.R. § 50.75(a). Financial assurance for decommissioning must be provided using one of the methods proscribed by the regulations, which include the use of an external sinking fund. 10 C.F.R. § 50.75(e)(1)(ii). "An external sinking fund is a fund established and maintained by setting funds aside periodically in an account segregated from licensee assets and outside the administrative control of the licensee and its subsidiaries or affiliates in which

the total amount of funds would be sufficient to pay decommissioning costs at the time permanent termination of operations is expected." *Id.* "An external sinking fund may be in the form of a trust." *Id.*

If a utility elects to utilize an NDT to provide financial assurance for its decommissioning process, the NDT must meet certain criteria. 18 C.F.R. § 35.32(a). It "must be an external trust fund in the United States, established pursuant to a written trust agreement, that is independent of the utility, its subsidiaries, affiliates or associates." 18 C.F.R. § 35.32(a)(1). "The utility may provide overall investment policy to the Trustee or Investment Manager, but . . . neither the utility nor its subsidiaries, affiliates or associates may serve as Investment Manager or otherwise engage in day-to-day management of the [NDT] or mandate individual investment decisions." 18 C.F.R. § 35.32(a)(2). "Absent the express authorization of the [Federal Energy Regulatory Commission ('FERC')], no part of the assets of the [NDT] may be used for, or diverted to, any purpose other than to fund the costs of decommissioning the nuclear power plant to which the [NDT] relates, and to pay administrative costs and other incidental expenses, including taxes, of the [NDT]." 18 C.F.R. § 35.32(a)(6). "If the [NDT] balances exceed the amount actually expended for decommissioning after decommissioning has been completed, the utility shall return the excess jurisdictional amount to ratepayers, in a manner the [FERC] determines." 18 C.F.R. § 35.32(a)(7).

**B.     Analysis**

"The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). However, a determination of damages for breach of contract is subject to "the general principle that the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed. Cir. 2003). "Where the defendant's wrong or breach of contract has not only caused damage, but has also conferred a benefit upon plaintiff . . . which he would not otherwise have reaped, the value of this benefit must be credited to defendant in assessing the damages." *Id.* at 1372 (quoting Charles T. McCormick, *Handbook on the Law of Damages* 146 (1935)). Similarly, an injured party's "mitigation efforts may [also] result in direct savings that reduce the damages claim." *Kan. Gas & Elec. Co. v. United States*, 685 F.3d 1361, 1366 (Fed. Cir. 2012). However, for the Court to offset an injured party's contract damages by benefits it experienced after a breach, the Court must find "a direct relation, in time and in subject matter, between the breach and mitigating events." *LaSalle*, 317 F.3d at 1371. "[U]nrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong." *Id.* at 1373. The "remote consequences of [a] contract breach, whether favorable or unfavorable to the non-breaching party . . . are not properly viewed as actions in mitigation" and thus do not serve to reduce a damages claim. *Id.* 1373-74.

> 1.     *The NDTs Are Not a Mitigation Activity and the Investment Earnings Are a Remote Consequence of the Breach*

First, the Yankees' establishment and maintenance of the NDTs is not a mitigation activity because there is no direct relation between the government's breach of the Standard Contract and the NDTs. Beginning in the 1980s, each of the Yankees opted to use an NDT, an external sinking fund, to satisfy NRC financial assurance requirements. [ECF 77] at 15. Because the Yankees established the NDTs prior to the government's breach, which occurred in 1998, there is no direct relation in time between the breach and the NDTs. *See LaSalle*, 317 F.3d at 1371. The establishment of the NDTs could not have been a direct consequence of the breach because it occurred prior to the breach. Furthermore, the Yankees' continued maintenance of the NDTs after the government's breach does not change this conclusion. The Yankees did not continue to maintain the NDTs as a mitigation activity or substitute transaction. *See LaSalle*, 317 F.3d at 1373 (stating that a "reduction of loss through a substitute transaction is generally a direct mitigation of damages"); *see also Indiana Michigan*, 422 F.3d at 1374) (stating that because the government is "exclusively responsible for SNF collection and disposal in the United States," no substitute transaction is possible in a spent nuclear fuel damages case). Rather, the Yankees maintained the NDTs to comply with NRC financial assurance requirements—which mandate that the Yankees ensure the availability of sufficient funds for decommissioning their nuclear facilities "at the time permanent termination of operations is expected." 10 C.F.R. § 50.75(e)(1)(ii). Since the government's breach, the Yankees have used their NDT funds to cover the costs of their ongoing SNF storage operations. Carla Pizzella Decl. [ECF 77-3] ¶ 37. Despite this, the purpose of the NDTs remains the same—ensuring the availability of funds to pay for decommissioning.[14] The purpose of the NDTs is not to pay for the recurring, breach-induced costs of storing the SNF until the government fulfills its contractual obligations. Therefore, in addition to there being no direct relation in time between the breach and the NDTs, there is also no direct relation in subject matter between the NDTs and the breach. *See LaSalle*, 317 F.3d at 1371.[15]

Next, the NDTs' investment gains are a remote consequence of the government's breach. It is undisputed that the Yankees continued to maintain the NDTs after the government's breach and that the NDTs experienced investment gains. However, the NDTs' investment performance is dependent on a variety of external factors that affect financial markets. *See, e.g.*, [ECF 77-3] ¶¶ 33-34 (noting that half of the funds in the Yankees' NDTs were invested in stock and half in bonds as a way of protecting the funds from unpredictable market forces). Furthermore, the

---

[14] The decommissioning of a nuclear facility "means to remove a facility or site safely from service and reduce residual radioactivity to a level that permits—(1) Release of the property for unrestricted use and termination of the license; or (2) Release of the property under restricted conditions and termination of the license. 10 C.F.R. § 50.2.

[15] Citing *Dairyland Power Cooperative v. United States*, the government argues that there is a direct relationship between the NDT investment returns and the Yankees' claimed costs, and that the damages calculations must account for this growth. [ECF 87] at 31-33 (citing [ECF 50] in Civil Action No. 18-1922 (Fed. Cl. Mar. 10, 2021)). In *Dairyland*, the court found that "there [was] a direct relationship between growth of the NDT due to the breach and Dairyland's use of its NDT to cover its decommissioning costs." *Dairyland*, [ECF 50] at 4. However, *Dairyland* is distinguishable. In *Dairyland*, the plaintiff sought damages for breach-induced fuel storage costs *and* for increased decommissioning costs due to the breach. *Dairyland*, [ECF 84] at 2. Although the court concluded that the NDT investment gains could be used to offset the claimed decommissioning costs, it did not conclude that those gains could be used to cover breach-induced fuel storage costs. *Dairyland*, [ECF 50] at 4. Thus, in the instant case, because the Yankees' claimed costs include only breach-induced fuel storage costs, *Dairyland* does not support the government's position.

funds in the Yankees' NDTs are held in trust, *id.* ¶ 25, and are invested and managed by an independent investment advisor, *id.* ¶ 32-33. Thus, in addition to the external market forces that generally affect investment performance, the NDTs' performance is dependent on decisions made by third-party investment managers. As a result, any investment gains earned by the NDTs are properly categorized as "downstream effects . . . that go beyond the first step of the breach." *Duke Energy Progress, Inc. v. United States*, 135 Fed. Cl. 279, 297 (2017). Just as the Yankees may not ask for increased damages should their NDT investments yield losses, the government may not ask for reduced damages due to gains in the Yankees' NDTs. *See Dominion Res., Inc. v. United States*, 641 F.3d 1359, 1365 (Fed. Cir. 2011) (noting that plaintiff "cannot ask for increased damages should its investment . . . return less than [anticipated], and the government cannot ask for a reduction in damages should [plaintiff's] investments return more"). The NDTs' gains are simply "too remote, too far removed from the breach, and the result of intervening investment risk," *id.*, to be deemed a consequence of the breach.

Citing *LaSalle*, the government argues that if it had timely performed the Standard Contract, the Yankees would have been out of business and therefore "any benefits that the Yankees have received while continuing to operate their businesses are a 'direct result of actions taken in mitigation of the breach, and are properly credited.'" [ECF 87] at 22 (quoting *LaSalle*, 317 F.3d at 1374). However, *LaSalle* is distinguishable. In *LaSalle*, after the breach, the injured party actively pursued an acquisition resulting in a $300 million capital infusion, which allowed the injured party to comply with capital requirements and avoid receivership. 317 F.3d at 1368. The Federal Circuit concluded that "[t]he recapitalization . . . [was] fairly viewed as . . . a substitute transaction[] and . . . that the injury . . . was subject to mitigation by this event." *Id.* at 1372. In the instant case, the establishment of the NDTs cannot be similarly viewed as a substitute transaction because the Yankees established them prior to the breach, not in response to or as a "direct consequence of the breach," *id.* at 1373. Further, the Yankees have not continued to maintain the NDTs as "cover" for the DOE's failure to accept the SNF. *See Duke*, 135 Fed. Cl. at 297 (holding that "no 'substitute transaction' is, or would have been, possible here"). The Yankees' continued maintenance of the NDTs stems not from a mitigation effort, but from federal regulations that still require them to provide reasonable assurance that funds will be available for the ultimate decommissioning of their nuclear facilities.

This conclusion is further supported by the Federal Circuit's decision in *Kansas Gas and Electric Company v. United States*, a case where a utility company similarly sought mitigation damages for the DOE's breach of the Standard Contract. 685 F.3d 1361 (Fed. Cir. 2012). In that case, as part of its mitigation efforts, the injured party sought approval from the NRC to "rerack its fuel storage pool and to use higher enrichment fuel assemblies." *Id.* at 1367. The rerack project resulted in a benefit to the injured utility in the form of monetary savings realized over time. *Id.* at 1368. The Federal Circuit found that "[t]he trial court correctly reduced the . . . damages to account for efficiency benefits from the rerack project." *Id.* at 1367. The Federal Circuit explained that the injured party "chose at the time of breach and mitigation to pursue higher enrichment fuel assemblies," that this decision "was not an independent business decision but part and parcel of the . . . mitigation efforts[,]" and that "[t]he long-term benefit of fuel cost savings does not sever its connection to the . . . mitigation efforts." *Id.* at 1367-68. The Federal Circuit was not persuaded that the "benefit was too remote because it accrued over time as influenced by market forces," *id.* at 1368. Unlike in *Kansas Gas and Electric*, where the injured

party acted to mitigate the government's breach, the Yankees did not establish the NDTs as a mitigation action. Instead, the Yankees established the NDTs prior to the breach to comply with regulatory requirements and continued to maintain the NDTs after the breach to remain in compliance.

### 2. *The Yankees Do Not Benefit from the NDTs' Investment Gains*

Lastly, the Yankees do not benefit from the NDTs' investment gains. To fund the NDTs, the Yankees collect money from their wholesale ratepayers—utility companies that purchased the nuclear power produced by the Yankees. [ECF 77-3] ¶ 23.[16] The wholesale ratepayers, in turn, collect money from their retail ratepayers—individual and corporate consumers of electricity. *Id.* ¶ 24. As noted above, the NDTs are external trusts, *id.* ¶ 25, that are invested and managed by independent investment advisors in accordance with FERC regulations, *id.* ¶ 32-33; *see also* 18 C.F.R. § 35.32(a). The Yankees may not engage in day-to-day management of the NDTs or mandate investment decisions. 18 C.F.R. § 35.32(a)(2). Further, without authorization from the FERC, the Yankees may not use the NDTs for any purpose other than decommissioning their sites. 18 C.F.R. § 35.32(a)(6).[17] The purpose of the regulations governing NDTs "is to protect the monies that ratepayers have contributed to the decommissioning of nuclear units." *Delmarva Power & Light Co.*, 81 FERC ¶ 61,385, 62,794 (1997); *see also* Nuclear Plant Decommissioning Trust Fund Guidelines, 60 Fed. Reg. 34109, 34113 (June 30, 1995) (to be codified at 18 C.F.R. pt. 35) ("By allowing public utilities with nuclear units to collect decommissioning funds in advance of decommissioning expenditures, the Commission has allowed the utilities to become fiduciaries for their ratepayers."); Nuclear Plant Decommissioning Trust Fund Guidelines, 60 Fed. Reg. at 34113 ("We are here setting requirements . . . for monies that [a public utility] is investing on behalf of its ratepayers to meet a future cash expenditure obligation, *i.e.,* decommissioning. In this instance, until the [public utility] meets its decommissioning liability, it is holding the monies that it collects for this purpose in trust for its ratepayers."). Ultimately, if the NDT funds exceed the amount necessary for decommissioning, any remaining monies must be returned to the ratepayers. *See* 18 C.F.R. § 35.32(a)(7). Because the NDT funds are not controlled by the Yankees and must be returned to the ratepayers after decommissioning is completed, the NDTs and their investment gains do not confer a benefit on the Yankees and, thus, do not offset the government's damages.

## IV. CONCLUSION

---

[16] The "wholesale ratepayers" are also referred to as "wholesale customers." [ECF 87] at 8. The wholesale ratepayers or customers are a group of utilities that own the Yankees. *Id*.

[17] Since the government's breach, the Yankees have used the NDTs as a funding source to pay for their ongoing ISFSI costs. [ECF 77] at 22. The Yankees' power contracts with their wholesale customers require the Yankees—to the extent that they receive proceeds from damage awards relating to the government's breach—to apply those proceeds as follows: first, to pay federal and state taxes due on the proceeds; second, to replenish the NDTs as necessary to maintain compliance with the financial assurance requirements; third, to reduce any scheduled charges for funding of the NDTs; and, fourth, to credit their purchasers. [ECF 77-3] ¶ 49. Thus, the damage awards are used to "restore NDT balances that were drawn down to pay the Yankees' operating costs," and then "to reduce scheduled charges to the Yankees' [w]holesale [c]ustomers or returned to the [w]holesale [c]ustomers." *Id.* ¶ 50.

For the reasons stated above, the Yankees' motion for partial summary judgment, [ECF 77], is **GRANTED**, and the government's cross-motion for summary judgment, [ECF 87], is **DENIED**. The Court will contact the parties to schedule a status conference regarding further proceedings.

Some information contained in this Opinion and Order may be considered protected information subject to the Protective Order [ECF 21] entered on October 12, 2021. Accordingly, the Opinion and Order is filed **UNDER SEAL**. The parties **SHALL CONFER** and **FILE on or before February 21, 2024**, a joint status report that: identifies information, if any, that the parties contend should be redacted; explains the basis for each proposed redaction; and includes an attachment of the proposed redactions for this Opinion and Order.

**IT IS SO ORDERED.**

                                                s/ Thompson M. Dietz
                                                THOMPSON M. DIETZ, Judge